VALLEY REGIONAL MEDICAL CENTER, Plaintiff,

v.

Phillip WRIGHT, M.D., Defendant/Third–Party Plaintiff,

v.

Columbia HCA Healthcare Corporation, Third–Party Defendant.

Civil Action No. B–99–171.

United States District Court, S.D. Texas, Brownsville Division.

Sept. 18, 2001.

See, also, 276 F.Supp.2d 638, 2001 WL 34128247.

ing, but also that Ms. Wilson actually saw the train and tried to cross in front of it.

Alfred T. Denham, Attorney at Law, McAllen, TX, for mediator.

William Robert Gault, Thomas Sullivan, Brin & Brin, Brownsville, TX, for Plaintiff.

George R. Neely, Attorney at Law, Houston, TX; Christopher Herbert Bos-

well, Stapleton Curtis et al, Harlingen, TX, Defendant/Third–Party Plaintiff.

Carlos A. Mattioli, Shannon Martin et al, Houston, TX, for Third–Party Defendant.

### MEMORANDUM OPINION

BLACK, United States Magistrate Judge.

Pending before the court is Plaintiff Valley Regional Medical Center's ("VRMC" or "Valley Regional") Motion for Summary Judgment (Docket No. 88) pursuant to FED.R.CIV.P. 56 and Third–Party Defendant Columbia HCA Healthcare Corporation's ("HCA") Motion for Summary Judgment (Docket No. 87) pursuant to FED. R.CIV.P. 56. For the reasons stated below, both motions are granted.

### FACTS

On June 1, 1993, Dr. Phillip Wright ("Wright"), a cardiac surgeon, entered into a Physician Assistance Agreement ("PAA") with Valley Regional Medical Center ("VRMC" or "Valley Regional"). The PAA was for a guaranteed term of two years, and its purpose was to "induce by assisting [Dr. Wright] in establishing a specialty practice" at VRMC in Brownsville, Texas. (PAA, Exhibit B of Valley Regional's Motion for Summary Judgment (Docket No. 88)). At the time that the PAA was executed, Valley Regional was owned and operated by Brownsville–Valley Regional Medical Center, Inc., ("Brownsville–Valley, Inc."). Brownsville–Valley, Inc., was a subsidiary of Healthtrust, Inc., ("HTI") a publicly-traded company. On April 24, 1995—about one month before the end of the guaranteed term of the PAA—a subsidiary of HCA merged with HTI. HCA is a corporation that owns and operates hospitals and healthcare facilities in the United States and abroad. As a result of the merger, HTI became a subsidiary of HCA, and Valley Regional Medical Center became an affiliate of HCA.

HCA, however, did not assume the obligations of HTI or Brownsville–Valley, Inc., as part of the merger.

Under the agreement, Valley Regional promised Dr. Wright a guaranteed annual income of $480,000 to be paid in monthly pro-rata amounts during the guaranteed term ($20,000 per month). If Dr. Wright's gross receipts for a particular month were *less* than the monthly pro-rata portion of the guaranteed income, Valley Regional had to pay the difference to Dr. Wright. If his gross receipts were *more* than the monthly pro-rata portion of the guaranteed income, then Dr. Wright had to pay the excess amount to Valley Regional as repayment for the amount advanced to him by the hospital.

Dr. Wright reported zero income for the months of June to October, 1993. Accordingly, Valley Regional paid Dr. Wright $20,000 per month for this period. From November 1993 to February 1994, Dr. Wright reported his gross receipts. Dr. Wright failed to submit any reports for the following four months (March June 1994). In a letter dated July 15, 1994, David Shoemaker, the Chief Financial Officer of Valley Regional, informed Wright of his failure to submit receipts and also requested that he repay the $20,000 advance made in April because his gross receipts exceeded the guaranteed income that month. (Attachment to Exhibit A, Valley Regional's Motion for Summary Judgment (Docket No. 88)). Dr. Wright complied with this request to the hospital's satisfaction, and he continued to submit his gross receipts through December 1994. During the last five months of the contract (January 1995–May 1995), however, Dr. Wright again failed to report any gross receipts, and the relationship between the parties terminated at that point.

What is more, the relationship between the parties during the term of the agree-

ment was far from smooth. Dr. Wright complained to the hospital administration because it became apparent to him that the hospital was not fulfilling its obligations under the agreement. Dr. Wright also complained to representatives of HCA. Finally, in November 1998, Dr. Wright and his attorney George Neely met with Richard Bracken,[1] Don Stewart,[2] Brian Woodward,[3] and Frank Houser[4] in Dallas, Texas, to discuss the terms of the PAA that had remained unfulfilled on both sides. Dr. Wright alleges that this meeting resulted in an oral agreement with HCA and Valley Regional to "close"[5] the cardiovascular surgery program at VRMC and to appoint Dr. Wright the Director of Cardiovascular Surgery Services.

Valley Regional filed this action, alleging breach of contract and an entitlement to payment on a sworn account. Dr. Wright asserted various counterclaims against Valley Regional, including breach of contract. Dr. Wright also filed a third party action against HCA, asserting that as the parent corporation, it should be liable for the acts of Valley Regional, and that it is independently liable for breach of contract and negligent misrepresentation.

Valley Regional and HCA now seek summary judgment. Valley Regional argues that it is entitled to summary judgment because it has established the elements of an action for a sworn account and breach of contract and that it is entitled to reasonable attorney's fees. Dr. Wright opposes the motion (Docket No. 94), arguing that Valley Regional's calculations are incomplete and unreliable because (1) the summary judgment evidence is conflicting, and (2) Valley Regional relies on the wrong contractual provision to determine the alleged amount owed. Dr. Wright further asserts that Valley Regional waived its right to enforce the agreement by not complying with Section D.5 of the contract, requiring a non-breaching party to provide a notice of an intent to terminate the agreement within 60 days of an alleged breach. Finally, Dr. Wright argues that Valley Regional is precluded from enforcing the PAA because it failed to perform its own obligations under the contract, and thus, Dr. Wright is entitled to an offset for damages that arise from the alleged counterclaims he has asserted against Valley Regional.

HCA urges a grant of summary judgment in its favor because it was not a party to the agreement between Valley Regional and Dr. Wright. Furthermore, HCA argues that a veil-piercing claim is not supported by the facts of this case because Dr. Wright has failed to establish that an actual fraud was committed for HCA's direct personal benefit. In his response (Docket No. 95), Dr. Wright contends that the oral representations made at the meeting form the bases of several causes of action against HCA, including breach of contract, negligent misrepresentation, tortious interference with contract

1. Richard Bracken was the president of the HCA Western Group, responsible for all of the HCA hospitals in the western part of the United States. He was also the president of Brownsville–Valley, Inc.

2. Don Stewart was a senior vice-president of Brownsville–Valley, Inc., as well as the HCA Divisional President for South Texas.

3. Brian Woodward served as in-house counsel for HCA and Valley Regional.

4. Frank Houser was an HCA official who served as a medical consultant for Valley Regional and HCA's other affiliated hospitals regarding its cardiology and cardiovascular surgery programs.

5. "Closing" a program is a hospital industry term that means that a specialty program is made exclusive or limited to one practitioner or his or her group.

or prospective contractual relations, conspiracy, and fraud. Alternatively, Wright claims that HCA and its subsidiary Valley Regional are a single business enterprise, requiring this court to pierce the corporate veil and hold HCA liable for the acts of VRMC.

The issue with respect to Valley Regional's motion is whether Dr. Wright is liable to the hospital for $141,376.83 plus interest at the contract amount of 8% from the date of breach to the date of judgment and attorney's fees. Furthermore, two issues are raised by HCA's motion: (1) whether the oral representations made to Dr. Wright at the Dallas meeting support independent claims for breach of contract and negligent misrepresentation against HCA, and (2) whether HCA should be held vicariously liable for the acts of its subsidiary Valley Regional. This court will discuss each issue separately.

## SUMMARY JUDGMENT STANDARD

Summary judgment evidence is viewed in the light most favorable to the nonmovant. *Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 456–58, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment is proper only when it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). An alleged factual dispute will not defeat a motion unless it is genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "material" if it involves a fact that might affect the outcome of the suit under governing law. *Douglass v. United Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996). Once the movant establishes the absence of a factual dispute, the burden shifts to the nonmovant to show that summary judgment is inappropriate.

The nonmoving party may not rest upon the mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Instead, the nonmovant must "make a showing sufficient to establish the existence of each essential element of its case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This evidence must do more than create a metaphysical doubt. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Unsubstantiated or conclusory assertions that a fact issue exists will not suffice. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

**I. Valley Regional's Motion for Summary Judgment: Whether Dr. Wright is liable to the Valley Regional for $141,376.83 plus interest at the contract amount of 8% from the date of breach to the date of judgment and attorney's fees**

### A. Elements of a Sworn Account

■ In Texas, the elements of a sworn account are (1) there was a sale and delivery of merchandise or the rendering of personal services; (2) the prices are charged in accordance with agreement or in absence of agreement, the prices are usual, customary and reasonable; and (3) the amount remains unpaid. TEX.R. CIV. P. 185; *Hose Pro Connectors, Inc. v. Parker Hannifin Corp.*, 889 S.W.2d 555, 558 (Tex. App.-Houston [14th Dist.] 1994, no writ).

■ All the elements of a sworn account exist in this case. Valley Regional and Dr. Wright entered into a contract in which in return for his services at Valley Regional, Dr. Wright was entitled to a guaranteed income. The guaranteed income was subject to set-off if his monthly gross receipts exceeded the monthly pro-rated amount of the guaranteed income. Valley Regional made all payments under the income guar-

antee, but Dr. Wright failed to submit all of his gross receipts and to repay the debt owed to the hospital. Valley Regional has submitted a systematic account of the payments made and credits received with respect to its contract with Dr. Wright.

Dr. Wright first contends that Valley Regional's summary judgment evidence is conflicting because it reveals three separate and unreconciled amounts. To support this contention, Dr. Wright points to several documents. He first refers to a letter dated October 7, 1998 offered by Valley Regional, reporting that the amount owed is $126,222.56.[6] He also points to the affidavit of Jay Johnson, the Chief Financial Officer of Valley Regional, which states that the amount of the debt is $141.376.83. Finally, Dr. Wright, indicates that Valley Regional's "earlier expert testimony produced in discovery" revealed that the amount owed is $139,114.58. Dr. Wright's contentions are meritless. First of all, Valley Regional has only sworn to one amount: $141,376.83. Moreover, the October 7, 1998, letter was not offered by Valley Regional to show the amount owed but to demonstrate that demand had been made. Finally, in an attempt to cloud the issue, Dr. Wright inaccurately characterizes Valley Regional's earlier expert report as "testimony." The report was neither sworn nor offered as summary judgment evidence by Valley Regional.

Dr. Wright makes one final attack with respect to the amount that is allegedly owed, arguing that there is "... a serious mathematical error in the calculation...." Dr. Wright's Response to Valley Regional's Motion for Summary Judgment. Dr. Wright asserts that Valley Regional relies on the wrong contractual provision to determine the amount of the debt. Ultimately, the parties disagree which provision controls the method to determine the amount owed to Valley Regional. Valley Regional argues that the formula for "Breach of Contract" damages as provided by Section F.3 applies. Section F.3 states:

[**F.3.**] *Consequences of Breach.* In the event of termination as a result of breach,

(a) The Physician shall be in breach if he fails to carry out, at any time during the full length of time agreed upon in Section 2 or elsewhere herein, any of the obligations or duties set forth in this Agreement. Upon the first breach by the Physician, the Physician shall have 30 days from the date of written notice in which to cure the breach to the Hospital's satisfaction, after which time the Agreement will terminate unless the Hospital agrees that the breach has been properly cured. Such agreement will not be unreasonably withheld. Upon subsequent breach of any sort by the Physician the Agreement will immediately terminate without notice. *Upon termination for breach by the Physician, the Physician shall immediately repay in full all amounts paid to him or on his behalf under this Agreement, together with interest hereon at the rate of 8% per annum from the date of each payment by the Hospital.* In no event shall this repayment obligation be prorated based upon the length of time the Physician has conducted the Practice or otherwise. Such termination and repayment shall be in addition to and not in lieu of any other remedy the Hospital may have as a result of the Physician's breach of this Agreement. [Italics added.]

Dr. Wright disagrees. He asserts that Section D.4 ("Final Repayment" formula) governs the method for calculating the alleged amount owed. Section D.4 provides:

---

**6.** This letter was offered by Valley Regional's motion for summary judgment as an attachment to the affidavit of Jay Johnson, the Chief Financial Officer of Valley Regional.

**[D.4.]** *Final Repayment.* Within 30 days following the end of the Guarantee Period, *the Hospital shall calculate the Physician's total Gross Receipts for the Guarantee Period, the total amounts paid by the Hospital during the Guarantee Period, and the total amounts already repaid by the Physician on a monthly basis, in order to determine whether any amounts are owed to either party.* If the total amount advanced by the Hospital, minus repayments already made by the Physician, is *less* than the amount to which the Physician was entitled under Section D.1, the Hospital shall pay the balance to the Physician within 45 days of the end of the Guarantee Period. If the total amount advanced by the Hospital, minus repayments already made by the Physician, is *more* than the amount to which the Physician was entitled under Section D.1, the Physician shall repay the excess to the Hospital within 45 days of the end of the Guarantee Period. [Italics added.]

This dispute requires that the court construe the contract in order to ascertain the appropriate provision that governs the method of calculating the amount owed to Valley Regional.

### B. Construction of the Physician Assistance Agreement establishes that there is no genuine issue of material fact as to whether the amount that is owed is in accordance with the terms of the contract

■ According to the rules of construction, the primary concern is to ascertain and to give effect the intentions of the parties as expressed in the instrument. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996). When the interpretation of a contract is in issue, the court must first decide as a matter of law whether the provisions in question are ambiguous. *Haddad v.*

*Wood,* 949 S.W.2d 438, 441 (Tex.App.-El Paso 1997, no writ). To determine whether an ambiguity exists, the court must examine the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Id.* However, if, after applying the rules of construction, the contract is susceptible to two or more reasonable interpretations, the contract is ambiguous and a fact issue exists as to the parties' intent. *Id.* If the meaning of the contract is uncertain or doubtful, summary judgment is improper. *Communications Transmission, Inc. v. TriStar Communications, Inc.,* 798 F.Supp. 406, 408 (W.D.Tex.1992).

■ An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Columbia Gas,* 940 S.W.2d at 589. For an ambiguity to exist, both interpretations must be *reasonable. Id.* When the parties disagree over the meaning of an unambiguous contract, the court must construe the contract within its four corners and give effect to the objective intent of the parties as expressed in or as apparent from the writing. *Phillips Natural Gas Co. v. Cardiff,* 823 S.W.2d 314, 317 (Tex.App.-Houston [1st Dist.] 1991, *writ denied* ). The interpretation of an unambiguous contract is a question of law, not fact. *Merritt–Campbell, Inc. v. RxP Prod., Inc.,* 164 F.3d 957, 961 (5th Cir.1999). Unambiguous contract language should be enforced as written, and the applicable standard is the objective intent, not subjective intent. *Communications Transmission,* 798 F.Supp. at 407. The court must examine the entire written agreement to harmonize and effectuate all of the provisions to ensure that none of the provisions will be rendered meaningless.

*Id.* The presumption is that the contracting parties intend every clause to have effect, unless the clauses are irreconcilable or repugnant. *Id.* A reasonable interpretation of the agreement will be preferred to an unreasonable one. *Id.*

As a matter of law, the PAA is not ambiguous as to which provision should apply to calculate the amount owed to the hospital because the contract is subject to only one reasonable interpretation. Wright urges that Section D.4 (Final Repayment) controls the method of determining Valley Regional's damages; however, this construction is unreasonable because it renders certain clauses of the PAA meaningless. Under the PAA, Wright was *required* to provide the hospital "... [o]n or before the *10th* day of each month ... [the] records showing [his] Gross Receipts for the preceding calendar month." (Section D.3.) This duty was explicitly set forth in the PAA. If this court accepts Wright's interpretation, then it ignores the fact that he was obligated to submit monthly reports under the plain terms of the contract. Wright's interpretation renders meaningless the first sentence of Section F.3, providing that

> [t]he Physician *shall be in breach* if he fails to carry out, at any time during the full length of time agreed upon ... *any* of the obligations or duties set forth in this Agreement. (Italics added.)

Wright's interpretation implicitly assumes that the failure to report gross receipts every month does *not* constitute a breach, yet the first sentence of F.3 explicitly defines the failure to carry out *any* contractual obligation as a breach by the Physician. Thus, Dr. Wright's failure to comply with his duty to report his gross receipts on a monthly basis as required by Section D.3 is a breach of the PAA. Therefore, the provision that unambiguously applies to calculate the amount allegedly owed to the hospital Section F.3, setting out the damages for a breach by Dr. Wright. Valley Regional has relied on this provision to determine the amount of Dr. Wright's debt: $141,376.83 plus interest at the contract amount of 8% from the date of breach to the date of judgment. Accordingly, Valley Regional has established as a matter of law all the elements necessary to maintain an action on a sworn account.

## C. Under the terms of the contract, Dr. Wright failed to establish that Valley Regional waived its right to recover the debt

Wright further argues that if Section F.3 applies—as this court believes it does—Valley Regional cannot prevail because it did not comply with Section G.5 ("Waiver") which states:

> [G.5.] *Waiver of Breach.* In any event, a nonbreaching party must *declare, in writing, an intent to terminate within sixty (60) days* of the alleged breach. The *failure to so declare shall constitute a waiver* of all right to terminate the Agreement or to any remedies provided by law for such a breach. [Italics added.]

Wright contends that Section G.5 is a condition precedent to recovery and that Valley Regional's failure to comply with the provision constitutes a waiver. Valley Regional disagrees and asserts that Section G.5 only addresses a non-breaching party's right to terminate the agreement before the end of the contract term.

In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract. *Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990). Again, the presumption is that the parties intended every clause to have some effect. When the intent of the par-

ties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. *Id.* Because of their harshness in operation, conditions are not favorites of the law. *Id.*

This court concludes that Valley Regional was not required to provide written notice of an intent to terminate the agreement as a condition precedent to its right to recover Wright's alleged debt. Requiring Valley Regional to provide a notice of intent to terminate as a condition precedent to recovery would impose an impossible result and render meaningless certain language in Section F.3:

> [**F.3.**] ... *Upon the first breach* by the Physician, the Physician shall have *30 days from the date of written notice in which to cure* the breach to the Hospital's satisfaction, after which time the Agreement will terminate unless the Hospital agrees that the breach has been properly cured. Such agreement will not be unreasonably withheld. *Upon subsequent breach* of any sort by the Physician the *Agreement will immediately terminate without notice.* [Italics added.]

If Section F.3 and Section G.5 are read together under Wright's interpretation, notice of intent to terminate under Section G.5 would be required after Dr. Wright's first breach, even though failure to report monthly gross receipts is implicitly *not* a ground for termination under Sections G.3 or G.4 of the contract, which will be explained below. Furthermore, according to Wright's interpretation, if Dr. Wright committed a subsequent breach, Valley Regional would be required to provide written notice of an intent to terminate under Section G.5 even though Section F.3 stipulates that the agreement terminates automatically without notice. Automatic termination makes it impractical for the non-

breaching party to provide a notice of intent to terminate pursuant to Section G.5.

Section G.5 is not a condition precedent of a breach that falls under Section F.3. Nevertheless, Section G.5 must be harmonized with the rest of the contract in order to ensure that each clause has effect as the parties presumably intended. This harmony is found by considering Sections G.3 and G.4 of the PAA. G.3 enumerates certain sections of the PAA that describe particular duties of the parties and states that a single breach of these duties is *not* a ground for terminating the agreement but a non-breaching party may elect to terminate the agreement upon a subsequent breach of the same duty. Section G.4 also enumerates contract provisions that set forth duties of the parties; however, G.4 provides that a single breach of these provisions is a basis for terminating the PAA at the option of the non-breaching party.

Section G.3 provides:

[**G.3.**] *Single Breach Not Grounds for Termination.* A single breach of the following terms of this Agreement shall not be grounds for termination of this Agreement: by the Physician—*Section B.3.a., b., d. and f.;* by the Hospital—*Section C.2., 4., 7., 8. and 9.,* [sic] A second breach of the same provision shall be a basis for the nonbreaching party, at its option to terminate the Agreement, as set forth in Section F., above. [Italics added.]

Section G.4 provides:

[**G.4.**] *Single Breach Grounds for Termination.* A single breach of the following terms of this Agreement may, at the option of the nonbreaching party, be a basis for the termination of this Agreement: for the Physician—*Section B.1, 2., 3. and 3.c;* for the Hospital—*Section C.1., 3., 4., 6. and Section D.* [Italics added.]

Sections G.3 and G.4 give the non-breaching party the *option* to terminate

the agreement when the other party has committed a breach of those provisions listed under either section. A breach of the provisions set forth in Sections G.3 and G.4 does not mean that the non-breaching party cannot provide the breaching party an opportunity to cure. It simply means that they now have the option to terminate the agreement if they choose to do so. Whether the party decides to terminate the agreement or not, Section G.5 states that *"[i]n any event,* a non-breaching party must declare, in writing, an intent to terminate within sixty (60) days of the alleged breach." (Italics added.)

It is important to recognize at this point that Sections G.3 and G.4 effectively exclude certain provisions the breach of which will *not* be grounds for terminating the agreement at the option of the non-breaching party. In other words, if a contractual duty is not among the provisions enumerated in Section G.3 or G.4, then a ground for termination does not exist, and a party does *not* have the right to provide a notice of intent to terminate under Section G.5.[7]

Section G.5 is the contractual provision that sets forth the notice a party must provide when it has grounds for termination under G.3 or G.4. A party may not provide a notice of an intent to terminate for an alleged breach that is not within the scope of G.3 or G.4 because Sections G.3 and G.4 explicitly identify which breaches of the contract are grounds for termination. It is unreasonable to require a notice of intent to terminate pursuant to Section G.5: (1) when the provision breached is not a ground for terminating the agreement under Sections G.3 or G.4;

(2) when, pursuant to Section F.3, the party has successfully cured a breach (unless that breach is of a provision enumerated under Sections G.3 or G.4); or (3) when the agreement has terminated automatically as a result of a (subsequent) breach under Section F.3.

Section D.3, outlining Dr. Wright's duty to report his gross receipts, is not enumerated in Sections G.3 or G.4. Thus, even though the failure to report gross receipts on a monthly basis constitutes a breach under Section F.3, this is not a ground upon which Valley Regional can terminate the agreement under Sections G.3 or G.4. Therefore, the non-breaching party does not have the right to provide a notice of an intent to terminate the agreement. The party must, however, provide an opportunity to cure under Section F.3. Ultimately, a violation of Section D.3 could not result in termination of the contract *unless* under Section F.3: (1) the Physician failed to cure after an opportunity to cure, or (2) the Physician cured, but subsequently breached Section D.3 or another provision of the contract.

In short, Valley Regional did not waive its right to sue for breach of contract damages because it did not provide a written notice of an intent to terminate the agreement. Dr. Wright's failure to report his monthly gross receipts constituted a breach of the agreement. Nevertheless, it was not a ground for termination under the terms of the contract. Thus, Valley Regional could not reasonably be expected to provide a notice of an intent to terminate the agreement if it did not have rights under the agreement to terminate the contract. The PAA specifically set out which contractual provisions the breach of which

---

7. This interpretation is reaffirmed by Section F.2 of the contract which provides:

[F.2] *Material Breach.* In the event of an *uncured, material breach* which is unexcused by the nonbreaching party, all *within*

*the meaning of Section G,* below, a non-breaching party may terminate this agreement upon thirty (30) days written notice to the other party at any time during the term of this Agreement. [Italics added.]

constituted grounds for termination; Dr. Wright's duty to report his gross receipts was not among those provisions enumerated.

■ At this point, Section F.3 was triggered because the provision that was breached fell outside the scope of Sections G.3 or G.4. Pursuant to Section F.3, Valley Regional provided Dr. Wright with an opportunity to cure his breach. The summary judgment evidence indicates that Dr. Wright was provided notice of his failure to submit monthly gross reports in a letter dated July 15, 1994, from David Shoemaker, the Chief Financial Officer at Valley Regional.[8] The letter stated:

*Dear Dr. Wright:*

*I need to receive your income guarantee settlement report for the months of March, April, May, and June showing actual collections. You have submitted March and April showing $20,000 plus but no actual figures.*

*[T]he contract states that the physician will make repayments when the guarantee is exceeded, and this section of the contract has not been amended to my knowledge.*

*Also we expected the $20,000 advance made on April 15th to be repaid in a few months but have seen nothing done on that . . . .*

Dr. Wright complied with this request, thus curing his first breach. Dr. Wright, however, once again failed to submit his monthly gross receipts in January 1995. As a result of his subsequent breach, the agreement terminated *automatically without notice* pursuant to Section F.3. Section G.5 did not apply—that is, Valley Regional was not required to provide a notice of an intent to terminate the agreement upon this subsequent breach—because, as explained, Dr. Wright's duty to report his gross receipts pursuant to Section D.3 was not a ground upon which Valley Regional could terminate the agreement under Sections G.3 or G.4. Because Section G.5 was inapplicable, Section F.3 governed the relationship of the parties: this was Dr. Wright's subsequent breach, requiring the agreement to terminate immediately without notice.

**D. Even if Valley Regional is itself in violation of the terms of the agreement, Dr. Wright is not entitled to an offset for damages because he waived his claims against Valley Regional**

■ Dr. Wright claims that he is entitled to an offset of damages because Valley Regional allegedly breached the contract. Specifically, Dr. Wright alleges that Valley Regional breached Sections C.1,[9] C.3,[10] and

---

8. While the summary judgment evidence includes an earlier undated letter from David Shoemaker to Phillip Wright, this court does not consider the undated letter as a notice of Dr. Wright's breach of the agreement. In the opinion of this court, the undated letter contains language that cannot reasonably be interpreted as acknowledgment of an actual breach. The undated letter states in relevant part:

*Dear Mr. Wright,*
*In my letter dated September 27, 1993 . . . I requested that you submit either financial statements or copies of deposit slips . . . .*
*I was admonished recently for processing your November income guarantee without*

*receiving support for the collections. I was instructed to process no further income guarantee payments until I receive the November documentation, and I must also receive the collection documentation on an ongoing monthly basis.*
*Thus, in order to process your December check, should there be an amount due, I need both your November and December collection support . . . .*

9. **[C.1]** *Commitment.* Generally, Hospital expresses its corporate commitment to the development of a heart center at the Hospital, and to take such actions as are reasonably necessary to assure that such a center is de-

C.4[11] of the PAA. In light of the court's construction of the contract as discussed above, this court holds that Dr. Wright is not entitled to an offset for damages because he waived his claims against Valley Regional.

Sections C.1 and C.3 are within the scope of Section G.4—that is, a single breach of these provisions is a ground for termination at the option of Dr. Wright. Moreover, Section C.4 falls within the scope of Sections G.3—that is, while a single breach of this provision is not grounds for termination, a second breach is. Because breaches of these provisions are considered "material"[12] under the contract, Dr. Wright had the election to terminate the agreement. Once Dr. Wright first recognized that Valley Regional failed to comply with one of these provisions, he was obligated to provide notice of an intent to terminate the agreement in order to preserve his right to any remedies under law. Dr. Wright failed to provide any notice of an intent to terminate, and pursuant to Section G.5, this constituted a waiver.

### E. Valley Regional is entitled to reasonable attorney's fees

Valley Regional has requested attorney's fees in the amount of $61,471.89 in this case pursuant to Tex. Civ. Prac. & Rem.Code Ann. § 38.001(7) (West 2001), allowing the recovery of fees on a claim based on a sworn account, and Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (West 2001), allowing the recovery of fees on a claim based on a written contract. In Texas, a prevailing plaintiff is entitled to an award of attorney's fees if there is proof of reasonableness. *Budd v. Gay*, 846 S.W.2d 521, 524 (Tex.App.-Houston [14th Dist.] 1993, *no writ*). Valley Regional has established that the fee award is reasonable and proper under § 38.001, and is therefore entitled to attorney's fees.

### II. HCA's Motion for Summary Judgment: Whether the oral representations made to Dr. Wright at the Dallas meeting support independent claims for breach of contract and negligent misrepresentation against HCA

### B. Dr. Wright has failed to present a genuine issue of material fact as to whether a contract was formed as a result of the representations made to him at the Dallas meeting

As a general rule, a contract generally binds no one except the parties to it. *BML Stage Lighting, Inc. v. Mayflower Transit, Inc.*, 14 S.W.3d 395, 400 (Tex. App.-Houston [14th Dist.] 2000, *pet. requested*). A party cannot be held liable under another party's contract without express or implied assumption of obligations of that contract. *Jones v. Cooper Indus., Inc.*, 938 S.W.2d 118, 124 (Tex.App.-Houston [14th Dist.] 1996, *writ denied*). Dr. Wright cannot claim that HCA is bound to

---

veloped, whether or not those actions are specifically set forth below.

10. **[C.3]** *Directorship.* Upon approval by the Hospital, the Physician will request and make such adjustments among support staff and equipment as to assure the smooth and efficient operation of surgical procedures. In this regard, the Hospital shall encourage the Medical Staff to establish a separate department, and shall appoint the Physician as Director of Cardiac Surgery.

11. **[C.4]** *Promotion.* Upon approval by Physician, the Hospital shall aggressively publicize its heart program in the community and surrounding area to the general public and specifically to primary care and other referring physicians, prominently featuring the Physician as cardiac surgeon.

12. *See* Section F.2, *supra* note 1.

the original contract he had with Valley Regional. Valley Regional and Dr. Wright entered into the PAA in June 1993. HCA did not participate in the negotiations of the contract and was not involved with Brownsville–Valley, Inc., or Valley Regional at that time. HCA did not become the parent corporation of HTI until April 1995. Furthermore, there is no evidence that HCA assumed any of the obligations of Valley Regional as a result of the merger. Because HCA was not a party to the original contract and did not assume VRMC's contractual duties, HCA is not bound under the PAA.

■ If HCA is not liable under the PAA as a party to that agreement, then Dr. Wright seeks to hold HCA liable based on a theory that HCA entered into its own contract with Dr. Wright at the Dallas meeting. According to Dr. Wright, HCA made an oral promise at the Dallas meeting to close the cardiovascular surgery services program and to appoint him director of the program at Valley Regional.[13]

Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Buxani v. Nussbaum,* 940 S.W.2d 350, 352 (Tex.App.-San Antonio 1997, *no writ*). Whether a particular agreement is an enforceable contract is a question of law. *Farah v. Mafrige & Kormanik, P.C.,* 927 S.W.2d 663, 678 (Tex.App.-Houston [1st Dist.]

1996, *no writ*). A contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 220 (Tex.1992). The material terms of the contract must be agreed upon before a court can bind parties to a contract. Where an essential term is open for future negotiation, there is no enforceable contract. *Id.* A contract will fail for indefiniteness if evidence is not presented on all essential terms. *Id.* at 221.

Dr. Wright has failed to present sufficient evidence to show a genuine issue of material fact as to whether a definite offer was made to appoint him the Director of Cardiovascular Surgery at Valley Regional. Dr. Wright claims that the offer to make him director was confirmed by an e-mail from Frank Houser to Mike Snow and Richard Bracken where Houser suggested that they "... should move ahead with the selection of the cardiovascular surgery services medical director and that the surgeon be Dr. Wright." Dr. Wright, however, testified in his deposition that the parties agreed at the Dallas meeting that the defendants would request the surgeons on staff to submit applications for the very position that Dr. Wright sought:

Question: Did they select the surgeon?

Answer: Not that I'm aware of.

Question: Did you understand, then, that they were going to go through the motions of making this an open application, but that no matter what

---

**13.** While the parties have failed to address this issue, this court believes that as a matter of law, the alleged oral contract between HCA and Dr. Wright comes within the statute of frauds. On its terms, this contract cannot be performed within one year from the date of execution; thus, TEX. BUS. & COMM.CODE ANN. § 26.01 (West 2001) applies. HCA did not plead this affirmative defense in its answer or in this motion. This court believes that HCA's failure to plead this defense with respect to this oral contract or to present evidence supporting it amounts to a waiver.

happened in the application (process), you were going to get the position?

Answer: No.

Question: Did they tell you that they were going to open it to other applicants other than yourself?

Answer: Yes.

Wright Deposition, p. 164. Thus, the parties had not agreed that Dr. Wright would be appointed director. Both of the parties understood that the director would be selected through an application process, and Dr. Wright himself acknowledged that other applicants would be considered for the position. The appointment of director was an essential term of the contract Dr. Wright alleges he had with HCA and Valley Regional. This term was left open because it was subject to the application process that the parties agreed would take place.

Moreover, Houser's e-mail cannot be construed as confirmation of HCA's intent to appoint Dr. Wright as director. Houser served as the Director of the Quality Department within HCA. His responsibilities included monitoring and assisting the hospitals in meeting their quality objectives. In his deposition, Houser made it clear that he did not "... have any line [of] authority to make (the hospitals affiliated with HCA) do anything different." Houser Deposition, p. 22. According to Houser, HCA's hospitals were free to use Houser's services or seek consulting services from an outside source. Houser's e-mail simply provided the kind of consulting services that were a part of his job within the organization. Dr. Wright has failed to present any evidence to show that Houser had the kind of authoritative position to bind either HCA or Valley Regional to close the program and to appoint Dr. Wright director.

## C. Dr. Wright has failed to establish a genuine issue of material fact with respect to his negligent misrepresentation claim against HCA

To establish a claim of negligent misrepresentation, a plaintiff must show (1) a representation made by the defendant in the course of his business or in a transaction in which he has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.,* 88 F.3d 347, 357 (5th Cir.1996). The false information supplied by the defendant must be a "misstatement of existing fact." *Id.* (Citing *Airborne Freight Corp. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 294 (Tex. App.-El Paso 1992, *writ denied* )). A defendant's guess as to a future unknown event does not constitute a negligent misrepresentation. *Sergeant Oil & Gas Co., Inc. v. Nat'l Maint. & Repair, Inc.,* 861 F.Supp. 1351, 1360 (S.D.Tex.1994).

In order to be actionable under a theory of negligent misrepresentation, HCA must have represented to Dr. Wright at the Dallas meeting that HCA and Valley Regional had appointed him director and had closed the cardiovascular surgery services program. Representations that indicated that the defendants *expected* or *planned* to appoint the plaintiff director do not amount to negligent misrepresentations. HCA and Valley Regional represented to Dr. Wright that they would conduct a review of all the applications received for the position and would consider Dr. Wright as a candidate. These are not misrepresentations of existing fact. At most, they predict Valley Regional and

HCA's future actions with respect to improving the hospital's cardiovascular surgery program. Dr. Wright's negligent misrepresentation claim should be dismissed because there is no genuine issue of material fact as to whether HCA made a misstatement of existing fact.

### III. HCA's Motion for Summary Judgment: Whether HCA should be held vicariously liable for the acts of its subsidiary Valley Regional

#### A. Dr. Wright has failed to meet the standard under Article 2.21 of the Texas Business & Commerce Code in order to hold HCA liable for the obligations of Valley Regional

Dr. Wright alleges several claims against Valley Regional, including breach of contract, negligent misrepresentation, tortious interference with contract or prospective contractual relations, anti-trust violations, conspiracy, and fraud. Dr. Wright requests that this court hold HCA liable for Valley Regional's alleged actionable conduct, claiming that the corporate veil should be pierced because HCA and its entities including Valley Regional operated as a single business enterprise.

Generally, a parent corporation has a separate legal existence from its subsidiaries, and the parent and subsidiary corporations should be treated separately unless circumstances suggest that the distinction between corporate entities should be disregarded. *Watkins v. Black & Decker (U.S.), Inc.*, 882 F.Supp. 621, 624 (S.D.Tex. 1995). Where a subsidiary company is not operated as a bona fide separate entity but as a mere agency or instrumentality of the owning company, the courts will look beyond the corporate form to determine the companies' true business relationship. *Siboney Corp. v. Dresser Indus.*, 521 S.W.2d 639 (Tex.Civ.App.-Houston [14th Dist.] 1975, *reh'g denied*).

Under the single business doctrine, when corporations do not operate as separate entities, but integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for the debts incurred in pursuit of that business purpose. *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999). The single business doctrine is an equitable remedy which applies when the corporate form is "used as part of an unfair device to achieve an inequitable result." *Id.* (quoting *Old Republic Ins. Co. v. Ex-Im Serv. Corp.*, 920 S.W.2d 393, 395–96 (Tex.App.-[1st Dist.] 1996, *no writ*)). In determining whether corporations have been maintained as separate entities, courts consider such factors as: common employees and offices; centralized accounting; payment of wages by one corporation to another corporation's employees; common business names; services rendered by the employees of one corporation on behalf of another corporation; undocumented transfers of funds between corporations; and unclear allocation of profits and losses between corporations. *Nichols v. Pabtex, Inc.*, 151 F.Supp.2d 772, 782 (E.D.Tex.2001).

Dr. Wright indicates that Richard Bracken, Don Stewart, Brian Woodward, and Frank Houser were all HCA officials or representatives who also held positions with and performed services for Valley Regional. Dr. Wright further relies on the deposition testimony of Mike Snow, who became the Brownsville–Valley, Inc., Vice-President and HCA Divisional President in 1999, to show that the distinction between the two entities was blurred. Snow testified:

> Answer: Well, the Columbia HCA owned Valley Regional. They were a subsidiary corporation in November of 1998.

Question: Okay. And who gave direction to the management of Valley Regional Medical Center in November of 1998?

Answer: The division responsible for Valley would have been the South Texas Division and its President was Don Stewart.

Question: It would be the South Texas Division of what?

Answer: What is now HCA.

Question: What is now HCA?

Answer: Columbia HCA.

Question: Okay. Now when you say Columbia HCA, are you talking about an entity different than Columbia HCA Management Services, Inc. or are you talking about Columbia HCA Management Services, Inc.

Answer: When I refer Columbia HCA, I am speaking in a generic—

Question: Okay.

Answer:—sense. If I am going to talk about the management company, I will say the management company.

Snow Deposition, pp. 17–18. However, this evidence without more is insufficient to demonstrate a genuine issue of material fact as to whether the operations of Valley Regional and HCA were so integrated as to result in a blending of the corporate entities. Dr. Wright has presented no evidence of centralized accounting; payment of wages by one corporation to another corporation's employees; common business names; undocumented transfers of funds between corporations; or unclear allocation of profits and losses between corporations. Reviewing the summary judgment evidence in the light most favorable to Dr. Wright, there is insufficient evidence to present a jury issue on single business enterprise.

 Even if Valley Regional and HCA were a single business enterprise, Tex. Bus. Corp. Act. art. 2.21 is the exclusive means to hold a parent corporation liable for the contractual obligations of a subsidiary or any matter relating to or arising from those obligations. Article 2.21 provides in pertinent part that:

A. [a] holder of shares ... shall be under no obligation to the corporation or its obligees with respect to: ...

(2) *any contractual obligation of the corporation or any matter relating to or arising from the obligation* on the basis that the holder ... is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder ... caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder[.]

B. The liability of a holder ... of shares of a corporation ... for an obligation that is limited by Section A of this article is *exclusive and preempts any other liability* imposed on a holder ... for that obligation under common law or otherwise, except that nothing contained in this article shall limit the obligation of a holder ... when:

(1) the holder ... has expressly assumed, guaranteed, or agreed to be personally liable to the obligee for the obligation; or

(2) the holder ... is otherwise liable to the obligee for the obligation under this Act or another applicable statute.

Tex. Bus. Corp. Act. art. 2.21 (Vernon Supp. 2001). Under article 2.21, Dr. Wright must demonstrate that HCA used Valley Regional as a means of perpetrating an actual fraud on Wright primarily for HCA's direct personal benefit. HCA's liability will be limited unless Wright shows that HCA expressly assumed, guaranteed, or agreed to be personally liable to the

obligee for the obligation or HCA is otherwise liable under another statute.

Dr. Wright has presented no evidence that HCA committed an actual fraud against Dr. Wright under article 2.21. To establish a claim of fraud, Dr. Wright must show that (1) a material representation was made, (2) it was false, (3) the speaker knew it was false when made or made it with reckless disregard of the truth, (4) the speaker intended for it be relied upon, (5) the plaintiff acted in justifiable reliance upon it, and (6) the plaintiff was injured by it. *T.O. Stanley Boot Co., Inc.*, 847 S.W.2d at 222 (Tex.1992). A promise of future performance constitutes fraud only "when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 359–60 (5th Cir.1996) (quoting *Airborne Freight Corp. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex.App.-El Paso 1992, *writ denied* )). Dr. Wright has failed to establish that HCA or Valley Regional made material representations that they knew were false. When asked if he believed Valley Regional or HCA never intended to follow through on the alleged representations, Dr. Wright testified in his deposition

> I believe they had an intention to, but did not. I thought they—that when we met in Dallas, that they intended to do all of the things that they said they were going to do.

Wright Deposition, p. 228. In fact, Valley Regional did set up a protocol for applying for the director of cardiovascular surgery, reviewed the applications, but then decided not to choose anyone for the position. The only evidence submitted shows that the representations were true at the time they were made. Dr. Wright cannot show actual fraud, therefore, his veil-piercing claims under article 2.21 fail.

Furthermore, Dr. Wright has not presented any evidence that Valley Regional's failure to close the program and appoint him the exclusive surgeon was primarily for HCA's direct personal benefit. The summary judgment evidence indicates that the Board of Trustees of Valley Regional acted in the perceived best interests of the hospital, not HCA, in deciding to keep the cardiovascular surgery program open, and no one outside the board was involved in that decision-making process. Dr. Wright objects to this evidence because he was not given an opportunity to cross-examine witnesses or examine documentary evidence regarding these issues. The court, however, believes this issue is moot because even if there is some evidence that HCA may have benefitted from Valley Regional's conduct, Dr. Wright has failed to present evidence that the representations at the Dallas meeting were fraudulent at the time they were made.

### *FINAL JUDGMENT*

Pending before the Court is Plaintiff Valley Regional Medical Center's Motion for Summary Judgment (Docket No. 88) and Third–Party Defendant Columbia HCA Healthcare Corporation's Motion for Summary Judgment (Docket No. 87). After careful consideration of this matter, the Court is of the opinion that Valley Regional's motion should be **GRANTED** and HCA's motion should also be **GRANTED.**

Judgment is rendered in favor of Valley Regional against Phillip Wright, M.D., in the amount of $141,376.83, plus attorney's fees in the amount of $61,471.89 and court costs. All relief not granted herein is **DENIED.**